IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERICA NICHOLS, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | No. 14-2172 |
| Acting Commissioner of the | : | |
| Social Security Administration, | : | |
|     Defendant. | : | |

### REPORT AND RECOMMENDATION

TIMOTHY R. RICE                                                                                          February 25, 2015
U.S. MAGISTRATE JUDGE

Plaintiff Erica Nichols alleges the Administrative Law Judge ("ALJ") erred in denying her application for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI") by failing to: (1) ask the vocational expert ("VE") hypothetical questions about her mild limitations; and (2) find she suffers from a severe mental impairment. See Pl.'s Br. (doc. 8) at 4, 9. I find the ALJ's determination was supported by substantial evidence and that her hypothetical questions properly incorporated all credibly established limitations, and recommend that Nichols' request for review be denied.

PROCEDURAL HISTORY

Nichols filed for DIB and SSI benefits on August 11, 2010, alleging disability as of April 17, 2010. R. at 205. Following a hearing, the ALJ denied Nichols' claim in an October 2012 opinion. Id. at 25-34. Applying the five-step sequential analysis,[1] the ALJ determined Nichols

---

[1] The ALJ considers whether a claimant: (1) is engaged in substantial gainful employment; (2) has one or more severe impairments, which significantly limit her ability to perform basic work; (3) has impairments that meet or equal the criteria associated with impairments in the Social Security Regulations so as to mandate a disability finding; (4) has a Residual Functional Capacity ("RFC") to perform work with her limitations and can return to her previous work with

had four severe impairments that did not meet or medically equal a Listing: [2] (1) migraines; (2) unspecified head injury; (3) vertigo; and (4) neck pain.  Id. at 24.  The ALJ also determined Nichols had a non-severe impairment of depression, but that her depression did not cause more than minimal limitations in any of the three functional areas: (1) activities of daily living; (2) social functioning; and (3) concentration, persistence, or pace.  Id. at 25-26.

The ALJ then found Nichols had the RFC to perform sedentary work with postural activities limited to "balancing, stooping, kneeling, crouching and crawling," "no overhead lifting," "no climbing," and no "dangerous or moving machinery, temperature extremes, and loud noises."  Id. at 28.  The ALJ discredited Nichols' statements regarding the intensity, persistence, and limiting effects of her symptoms, and relied on VE testimony to conclude that Nichols could still perform her past relevant work as a claims clerk and telemarketer.  Id. at 32.  The ALJ also made the alternative finding that Nichols could perform the jobs of order clerk, surveillance system monitor, and parking lot cashier.  Id. at 33.

## FACTUAL HISTORY

Nichols, 30 years old at the time of the ALJ's decision, is one course shy of a bachelor's

---

that RFC; and (5) can perform any other work existing in the national economy.  See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

[2]   The Listing of Impairments in Appendix 1, Subpart P, Part 404 of 20 C.F.R. is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing any gainful activity, not just substantial gainful activity.  Id.; 20 C.F.R. §§ 404.1525(a), 416.925(a) (purpose of the Listing is to describe impairments severe enough to prevent a person from doing any gainful activity).  The Listing was designed to operate as a presumption of disability, making further inquiry unnecessary.  Sullivan, 493 U.S. at 532.

degree, and lives with her father and two children in Philadelphia. Id. at 48, 53, 204. She previously worked as an insurance claims examiner, id. at 184, a telephone sales connection specialist, id. at 67, and a claims clerk, mental retardation aide, and telemarketer, id. at 68. In April 2010, Nichols had just begun training to work for the United States Census Bureau when she was involved in car accident. Id. at 54-55. Although she declined medical treatment at the scene of the accident, two hours afterwards she came to the emergency room complaining of head and neck pain, nausea, vomiting, dizziness, and numbness. Id. at 274, 277. After normal CT scans of her lumbar spine, thoracic spine, cervical spine, and head,[3] Nichols was discharged with a finding of "minor" "strains." Id. at 278, 280-82.

Her disability application focused primarily on physical impairments stemming from the 2010 accident, summarized below.

Two days later, Nichols had retained an attorney and began treatment with the Neurology department of Temple University, complaining of migraine, vertigo, and nerve damage, and reporting that a "test given" showed "no feeling in arms," weakness in "arms, legs, [and] back" and that an MRI had found a "disk protrusion" in her neck. Id. at 652. At this initial neurology evaluation, Nichols reported that she worked 30 hours per week in insurance claims, and used a walker. Id. at 653. About a week later, Nichols came to the emergency room at Abington Hospital, complaining of daily headaches that were not relieved by the medication she had been

---

[3] Nichols testified that she also suffers from Chiari malformation, which requires her to ice her head regularly. Id. at 69. Although findings on Nichols' various brain scans suggested that part of her brain is "low-lying," id. at 314, 410, she has been tested for, and does not have Chiari I malformation, id. at 303, 314, 412-13. Chiari I malformation is the mildest form of a congenital anomaly in which part of the brain protrudes into the spinal column. Dorland's Illustrated Medical Dictionary, (32nd ed. 2012) at 342, 1098.

taking to address her migraines before the accident. Id. at 301. She was given additional painkillers, and sent home. Id. A few days later, a cervical spine MRI showed a "small disc protrusion," but "no cord compression at any level." Id. at 312.

A few days after that, on May 3, 2010, one of her neurologists, Dr. Katz, wrote Nichols a prescription authorizing her "return to work." Id. at 347. The next day, her primary care physician wrote a note explaining that Nichols had been out of work since the date of the accident because of her injuries, and that her return date was "undetermined" because she was still "under [his] care." Id. at 346. On May 13, 2010, Dr. Katz evaluated Nichols, noted her increased complaints, and opined that Nichols would "be off work for two weeks." Id. at 316.

On May 18, 2010, Nichols was examined at Allied Medical Associates, and complained of extensive pain in her head and back, problems using her hands, and "completely numb" legs. Id. at 327-29. She saw an orthopedic surgeon at Allied who recommended physical therapy, limiting her activity, obtaining an additional MRI, getting injections to reduce her back pain and taking pain medications. Id. at 326. After 11 of her 12 physical therapy appointments with Allied, Nichols reported feeling "better overall." Id. at 333.

On June 25, 2010, however, Nichols was admitted, via the emergency room, to Temple University hospital for an extended stay. Id. at 369, 377. The medics that brought Nichols in described her "lay[ing] down in [the] middle of [the] street and refus[ing] to move or get up." Id. at 377. She was admitted to the hospital to rule out a stroke or heart attack, but once she had been stable for more than 48 hours she refused to leave, and instead made "complex neurologic complaints with no observed physical findings." Id. at 370. She finally agreed to be discharged "in to the care of her mother," and her doctors recommended she follow-up with her neurologists

4

and undergo "vestibular rehab."[4]  Id.  She did both, and when she applied for disability benefits on August 11, 2010, her interviewer observed no difficulties with her hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, seeing, using hands, or writing, but did observe that she had problems standing and walking (she was using a walker).  Id. at 205.

On September 13, 2010 Nichols complained in a social security function report of numerous difficulties including double vision, concentration, and memory problems, but told her therapist that she planned to return to work for four hours per day.  Id. at 224, 440.  By October 4, 2010, her neurologist rated her "baseline symptoms" at level 2/5, and Nichols reported that she was not depressed and her vertigo did not interfere with her reading.  Id. at 435.  By October 18, 2010, she had yet to return to work as an insurance claims specialist or census enumerator, but told her vestibular therapist that she had begun to work for her father.  Id. at 610.

On November 10, 2010, Nichols was examined by Harris Ross, D.O. who found that she showed symptoms consistent with a concussion, including chronic dizziness, coordination problems, memory loss, and possible spinal cord injury.  Id. at 486.  On November 29, 2010, she was re-evaluated by her vestibular therapy provider, who found her symptoms had significantly improved, and her complaints were now mainly focused on her pain.  Id. at 603-08.  In December 2010, Nichols learned she was pregnant, id. at 678, her vestibular therapist "continue[d] to address [her] compliance," id. at 596, her neurologist noted that she walked with

---

[4]  Vestibular rehabilitation is "an exercise-based program, designed by a specialized physical therapist, to improve balance and reduce dizziness-related problems." http://my.clevelandclinic.org/services/rehabilitation-sports-therapy/specialty-therapy-services/hic-vestibular-rehabilitation (last visited Feb. 25, 2015).

a cane, id. at 554, and she was in another car accident, id. at 582. Her date-last-insured was December 31, 2010, eight and a half months after her original accident. Id. at 187.

In January 2011, Nichols still reported her pain caused her great difficulties, id. at 587-93, but her vestibular therapist reported: "conflicting reports of abilities (shovels snow, had a snowball fight with her boyfriend) but insists on ambulating with a [cane], or furniture 'walking,'" id. at 583. Nichols was discharged from vestibular rehabilitation on February 3, 2011, after demonstrating she was "ambulatory with 5" heels with good speed [and] no loss of balance," and "arms relaxed at [her] sides." Id. at 579. She was found to have a "minimal disability" based on her self-reported symptoms. Id. at 572.

Nonetheless, Nichols told examiner Lori Hart, Ph.D., that she needed her walker "due to vertigo and the fear that she will fall" when she saw Dr. Hart five days later. Id. at 495. Nichols denied any history of mental health treatment, any mental health symptoms or any mental health concerns, and Dr. Hart found Nichols had no functional limitations after her cognitive testing revealed intact long-term memory, a "fair fund of information, good abstract reasoning, and average general cognitive ability." Id. at 496-97. On March 1, 2011, Nichols' neurologist found she was now having episodes of vertigo two to three times per week, but that they were relieved by medication. Id. at 553. He found her migraines could be controlled by another medication that she was unable to take during the first trimester of her pregnancy. Id.

On March 9, 2011, a medical record reviewer for Social Security, Paul Perch, Ed.D., performed a psychiatric review technique on Nichols' records, found only mild functional limitations with no episodes of decompensation, and concluded Nichols had no severe impairment based on her organic mental disorder. Id. at 498-99. He advised adopting Dr. Hart's

6

report because it was "fairly consistent with the other evidence in [the] file." Id. at 510.

On April 29, 2011, Nichols began mental health treatment at the Wedge Medical Center. Id. at 664. She complained of being "mad, depressed, stressed," and reported "feeling this way off and on since [she was] 16 years old." Id. She reported that her mental health history included one previous suicide attempt, a span of family therapy during high school, another span of therapy in college, and leaving college in 2005 "for behavioral health reasons." Id. at 667, 673. She stated that she had been self-employed at T&W contracting since 2009, and that she had recently had an ebay business shut down. Id. at 674. She was given a diagnosis of major depressive disorder, recurrent, severe, and assigned a Global Assessment Functioning ("GAF") score[5] of 41. Id. at 675. Her recovery and wellness goals were to: (1) decrease and/or eliminate depressive symptoms; (2) manage her anger more effectively; (3) increase her social network; and (4) begin saving money on a monthly basis. Id. at 680.

On May 3, 2011, Nichols saw her neurologists and, although her exam was negative, complained again about migraines and dizziness. Id. at 552. She was given additional medication and told to continue vestibular rehabilitation, although there is no evidence in the

---

[5] GAF scores (on a 100-point scale) reflect the mental health specialist's assessment on a particular day of the severity of a patient's mental health, and are based on the patient's state of mind and symptoms. Diagnostic and Statistical Manual of Mental Disorders (4th ed. Am. Psychiatric Assoc. 2000) ("DSM-IV") at 34. A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

GAF scores have not been included in the most recent version of the DSM, published in 2013, due in part to their "conceptual lack of clarity" and lack of validity. Diagnostic and Statistical Manual of Mental Disorders (5th ed. Am. Psychiatric Assoc. 2013) at 16.

record that she went back to vestibular therapy after her February 2011 discharge.[6]  Id.  The next day, at the Wedge, she was assessed as having normal intelligence, normal motor behavior, unremarkable thought content, normal perception, logical goal-directed thought processes, fair insight, fair memory, and fair judgment, diagnosed with major depressive disorder, and assigned a GAF score of 50.  Id. at 684.  Only weekly individual therapy was recommended.  Id.

On May 18, 2011, Nichols reported to Social Security that there were no changes in her symptoms, id. at 242, and on May 31, 2011, she began therapy, id. at 809.  She discussed her professional goals, including finishing her degree and pursuing licenses in real estate and cosmetology.  Id. at 809.  Her therapist had her make a list of potential employers.  Id. at 810.  She continued with therapy until the ALJ hearing, and some of the information discussed with her therapist was inconsistent with her abilities as reported to Social Security.  For example, although she claimed not to have worked since her alleged onset date, in June 2011 she complained to her therapist about not having told her new employer about her pregnancy, id. at 807, and in July 2011 she reported having "a good week" because she got a job working from home, id. at 802.  She also participated in extensive "journaling" during her therapy, id. at 804-05, although she testified that she was unable to read because of her vertigo, id. at 53-54.

On July 28, 2011, her neurologist noted Nichols was "doing well – off medication" in terms of her migraines, id. at 551, and on September 9, 2011, she discussed with her therapist the "lucrative" home refinishing business she ran with her father, id. at 790.  Nichols' second child was born in September 2011, and in October 2011 she reported to her neurologist that her

---

[6]     Nichols' attorney stated that she did return to vestibular rehabilitation for a few sessions in August 2012, although no records of this visit are included in the record.  Id. at 46-47.

migraines had started to increase following delivery, and she was now having daily headaches, with four "severe" headaches per month. Id. at 522. Her neurological exam, including muscle bulk, tone, strength, sensory, gait, coordination, and reflexes were all normal. Id. at 523-24. She was given a daily vitamin, and instructed to take only Tylenol for pain because she was breastfeeding. Id. at 522, 524.

Nichols' therapy notes reflect her ability to clean her own home, id. at 779, host houseguests, id. at 764, host 25-30 people for an elaborate, expensive meal, id. at 753, pay off her student loans with a tax refund, id. at 736, attend a weekend religious retreat, id. at 724, and take care of both of her divorced parents when they were diagnosed with cancer at the same time, id. at 733. In April 2012, Nichols told her neurologist that the vitamins were not working to prevent her migraines anymore, and she was again experiencing daily headaches. Id. at 541. She was advised to return for additional medications after she finished breastfeeding. Id. at 542.

Nichols' ALJ hearing was originally scheduled for April 26, 2012, and at that time she testified that she was alleging disability based on "vertigo" and "severe migraines." Id. at 40. She explained she would "walk into walls," couldn't keep "food down because the room spins," and that she had been diagnosed with bipolar disorder. Id. She stated that she attended physical therapy to address "a protruding disk" and claimed to still "have issues" regarding falling "and stuff like that." Id. at 41. Once Nichols realized she was entitled to obtain the services of a lawyer to assist her in an ALJ hearing, she elected to continue her hearing at a later date. Id. at 39-40.

In May 2012, Nichols' psychiatrist described her symptoms as "mild," id. at 688, and she took her two children on a trip to Disneyworld, id. at 712. On September 13, 2012, she told her

neurologist she was in the process of weaning her child, and was prescribed additional medications for her migraines. Id. at 820. Her motor exam, sensory exam, gait, coordination and reflexes all tested as normal. Id. at 821. On September 14, 2012, Nichols was examined by Sisira Yadala, M.D., who filled out a residual functional capacity assessment for her based on the reports she provided of her headaches at that visit. Id. at 812. Dr. Yadala opined that Nichols' impairment was likely to last twelve months, would preclude working, and would likely result in more than four absences per month. Id. at 815-16. At her September 2012 ALJ hearing, Nichols testified that, although she no longer needs a walker or cane, she still uses the walls for support as she walks but "the major problem is the migraines," id. at 47, she only drives occasionally and has been told not to drive although she did drive herself to the hearing, id. at 50-51, she suffers a constant tremor and can only stand for five or ten minutes, id. at 59.

## DISCUSSION

A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505, 416.905; see also Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 503 (3d Cir. 2009). A "medically determinable physical or mental impairment[]," must be established "by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. §§ 404.1505(a), 404.1508, 416.905(a), 416.908. Such impairment cannot be based solely on a claimant's statement of symptoms. Id. §§ 404.1508, 416.908. Instead, the ALJ must consider all evidence in the record and explain his reasoning. See id. §§ 404.1520(a)(3), 404.1527(c), 416.920(a)(3), 416.927(c). Any relevant evidence that is

discounted must be specifically addressed.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).   Evidence cannot be rejected "for an incorrect or unsupported reason." Zirnsak v. Colvin, No. 14-1168, 2014 WL 7799983, *4 (3d Cir. 2014).

I must accept all the ALJ's fact findings if supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390 (1971); see also 42 U.S.C. § 405(g).  I "review the record as a whole to determine whether substantial evidence supports a factual finding," Zirnsak v. Colvin, No. 14-1168, 2014 WL 7799983, *2 (3d Cir. Dec. 9, 2014), but I may not re-weigh the evidence or substitute my own conclusions for those of the ALJ.  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).  Credibility determinations are reserved for the ALJ. 20 C.F.R. §§ 404.1529, 416.929; Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  I must, however, conduct a "plenary review" of the ALJ's legal conclusions.  Payton v. Barnhart, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006).  Thus, I can overturn an ALJ's decision for a legal error even if I find it was supported by substantial evidence.  Id.

    I.       Failure to Find Nichols' Mental Impairment was Severe

Nichols claims the ALJ failed to support her determination that Nichols' depression was nonsevere with substantial evidence.  Pl.'s Br. at 9.

The burden placed on the claimant to establish a severe impairment "is not an exacting one."  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004); see also Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546-47 (3d Cir. 2003) (the step-two inquiry is a de minimis screening device).  A medically determinable impairment is severe as long as the claimant demonstrates "something beyond 'a slight abnormality or a combination of abnormalities which

would have no more than a minimal effect on an individual's ability to work.'" McCrea, 370 F.3d at 360 (quoting SSR 85-28, 1985 WL 56856, at *3); see also Bowen v. Yuckert, 482 U.S. 137, 153 (1987). "Any doubt as to whether this showing has been made is to be resolved in favor of the applicant." Id.

To support her finding, the ALJ relied on Dr. Hart's February 2011 consultative examination and Nichols' therapy records. Id. at 25. Nichols' date-last-insured was December 31, 2010. Id. at 187. As the ALJ accurately summarized, at Dr. Hart's February 2011 consultative examination, Nichols denied any mental health concerns, and displayed cooperative mental status, slow speech, normal stream of thought, intact long-term memory, adequate concentration, the ability to add, subtract, and multiply, a fair fund of information, good abstract reasoning, and an average general cognitive ability. Id. at 25, 496.

The ALJ's review of Nichols' therapy records is similarly accurate. She noted Nichols began therapy because she was feeling "mad, depressed and stressed." Id. at 25. She described the results of Nichols' mental health status examination, which were that Nichols was "neat, well groomed, cooperative, had normal intelligence, a depressed and sad mood, but a logical and goal-directed thought process, fair insight, normal motoric behavior, fair memory and fair judgment." Id. at 25. She also noted Nichols' conservative treatment, which consisted of no psychotropic drugs, and therapy that largely took place weekly. Id. She noted Nichols' improving GAF scores, which the Commissioner correctly asserts cannot by themselves establish disability. Def. Br. at 8 (citing Smith v. Astrue, No. 11-1230, 2012 WL 6012709 (M.D. Pa. Dec. 3, 2012), Gilroy v. Astrue, 351 F. App'x 714, 715-16 (3d Cir. 2009)). Finally, the ALJ noted Nichols' activities, as reflected in Nichols' therapy notes, which showed her mental impairments

were not severe.  Id.  These included obtaining a new job in June 2011, engaging in a joint business with her father remodeling homes, cooking and hosting Christmas for 25-30 people, attending church regularly, paying off her student loan debt, attending a weekend church retreat, taking a family vacation with her children and mother in May 2012, and caring for her school-aged daughter, infant son and two parents battling cancer.  Id.

The ALJ found Nichols had a mild limitation in her activities of daily living, and noted that Nichols reported getting her daughter ready for school, feeding her baby, going to physical therapy, helping her daughter with homework, cooking breakfast, lunch, and dinner daily, cleaning her home, and washing her clothes, although she did claim to receive some help from friends and family and testified that she struggled physically with childcare and paid someone to clean her home.  Id.  The ALJ found Nichols had a mild limitation in social functioning, and set forth Nichols' reports that she drives and rides in cars, shops in stores, spends time with friends, and attends vestibular therapy regularly.  Id.  Finally, the ALJ found Nichols had a mild limitation in concentration, persistence or pace, and contrasted Nichols' ongoing reports of migraine headaches and short-term memory loss since her accident with the results of her February 2011 mental status examination.  Id. at 26.  Finally, the ALJ noted Nichols had no episodes of decompensation of extended duration.  Id.

Each of the ALJ's conclusions is supported by substantial evidence that justified her determination that Nichols' mental health impairment did not "significantly limit" her ability to work, and was therefore nonsevere.  Bowen, 482 U.S. at 146.

II.     ALJ's Failure to Include Mild Limitations in VE Hypothetical

Nichols claims the ALJ erred by failing to ask the VE hypothetical questions that

13

included Nichols' mild limitations in the three functional areas assessed for organic brain disorders. Pl.'s Br. at 4.

An ALJ may consider VE testimony in determining whether a claimant is disabled only if the hypothetical questions accurately portray all of the claimant's credibly established physical and mental impairments. Rutherford v. Barnhart, 399 F.3d 546, 553-54 (3d Cir. 2005); see also Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir. 2004) (VE's opinion must reflect "all of the claimant's impairments that are supported by the record"); Burns, 312 F.3d at 123 (hypothetical questions posed to a VE "'must reflect all of a claimant's impairments'") (quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Hypothetical questions posed to a VE should include even mild functional limitations. See 20 C.F.R. §§ 404.1545(a)(2) 416.945(a)(2); see also Sanchez v. Colvin, No. 12-5658 (E.D. Pa. Aug. 7, 2013) (remanded due to ALJ's failure to include claimant's mild limitations in three areas of mental health functioning); Curran v. Astrue, No. 11-5894, 2012 WL 5494616, *5 (E.D. Pa. 2012) (same); Harmon v. Astrue, No. 10-6781, 2012 WL 94617, *2 (E.D. Pa. Jan. 11, 2012) (same); Washington v. Astrue, No. 08-2938, 2009 WL 855893, at *1-2 (E.D. Pa. Mar. 31, 2009) (same with mild limitations in two functional areas). The ALJ, however, is not required to submit to the VE claimed limitations that have been "reasonably discounted" because they are: (1) not supported by objective medical evidence; (2) contradicted by the claimant's medical records; or (3) contradicted by the claimant's own testimony. See Rutherford, 399 F.3d at 554-56.

The ALJ concluded Nichols' mental impairments were non-severe, but caused mild limitations in the three functional areas, otherwise known as "paragraph B" criteria, used for

evaluating mental disorders. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C. In most cases, a finding of mild limitation is credibly established and relevant to the VE's assessment. See Rutherford, 399 F.3d at 554-55; see also Schearer v. Colvin, No. 12-477, at 8 (E.D. Pa. Dec. 13, 2013) (ALJ's failure to pose hypothetical question to the VE concerning a mild limitation in concentration persistence or pace constituted legal error and required remand). Here, however, the particular facts of Nichols' case do not require remand.

At the hearing, the VE testified that an individual of Nichols' age, education, and work experience with the ability to lift "up to ten pounds, sit for six hours, stand and walk for two hours, [perform only] occasional postural activities, no climbing, avoidance of dangerous or moving machinery, no overhead lifting, avoidance of temperature extremes, [and] avoidance of workplace with loud noises on a constant basis" would be able to perform two of Nichols' past relevant jobs, working as a claims clerk and as a telemarketer. R. at 68-69. The VE testified that there also were other jobs she could perform, including order clerk, surround system monitor and parking lot cashier. Id. at 69. The VE testified this was based on the DOT and his own expertise. Id. When given the opportunity to cross-examine the VE, Nichols' attorney asked if she would be able to maintain a job in the competitive environment if she was "off task 20 percent or more of the time based on the complaints of vertigo or pain and for whatever reason," and the VE responded that she would not. Id. He then asked if she would be able to maintain competitive employment if she had to miss work more than four times per month for migraines, and was told again that she would not. Id. Nichols' attorney did not question the VE on the impact, if any, of her mild mental health limitations.

When Nichols applied for benefits in August 2010 and was asked to list "all physical or

emotional conditions that limit [her] ability to work," she listed "vertigo, can't feel arms and legs, fall risk, migraines, slight brain injury, C6 and C7 nerve damage, short term memory loss," and "protruding disc in neck." Id. at 208. In a supplemental function questionnaire, Nichols specified that she was going to see a psychologist/psychiatrist "not for pain but memory loss." Id. at 226. Nichols did not claim she suffered any mental health limitations.

When she was evaluated for mental impairments in February 2011, Nichols denied any mental health concerns, and tests of her cognitive ability revealed no functional limitations. Id. at 496-97. Dr. Hart opined Nichols "is likely to be able to understand simple and/or detailed job instructions . . . carry out job instructions . . . adjust to minor changes in work routine[,] cope with minor work stressors without impairment[,] follow work rules[,] respond appropriately to supervisors [and] interact fairly well with coworkers as well as the public across time." Id. at 497. Dr. Hart also concluded that Nichols' "social and communication skills abilities [sic] appear to be good." Id. After reviewing Nichols' medical records, Paul Perch, Ed.D., concurred with Dr. Hart's assessment of Nichols' "organic mental disorder – closed head injury." Id. at 499.

Because the physical impairments Nichols complained of – head injury, migraines, etc. – have a mental component as well, the ALJ was assessing both her physical and mental impairments when addressing the Paragraph B criteria of her "organic mental disorders." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C. Thus, Nichols was found to have "mild" limitations based on: (1) "struggl[ing] physically to care for her children" and "pay[ing] someone to clean her home," R. at 25; (2) "attend[ing] vestibular therapy regularly," id.; and (3) her own reports of migraines and short-term memory loss, id. at 26. In contrast, most of the cases

Nichols cites address hypotheticals to VE's that included only limitations based on claimants' physical impairments, leaving out entirely any limitations based on mild mental impairments.[7] The remaining cases[8] are inapposite because they are not based on alleged physical impairments that are evaluated with the same Paragraph B criteria as mental health impairments.[9]

The ALJ reflected Nichols' limitations, as they specifically affect what she "can do in a work setting," 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1), by limiting her exposure to postural activities, dangerous or moving machinery, temperature extremes, and loud noises, R. at 28. Moreover, to the extent that Nichols, who was one course shy of a bachelor's degree at the time of the ALJ's decision (id. at 53) and had a history of performing skilled work (id. at 68), is limited at all in terms of her mental abilities, the ALJ found she was able to perform prior work

---

[7] Shearer v. Colvin, No. 12-4774 at 4 (E.D. Pa. Dec. 12, 2013); Sanchez v. Colvin, No. 12-5658, at 7 (E.D. Pa. Aug. 7, 2013); Melendez v. Astrue, No. 12-4773, at 11 (E.D. Pa. June 24, 2013); Curran v. Astrue, No. 11-5894, 2012 WL 5494616, at *5 (E.D. Pa. Nov. 13 2012); Carter v. Astrue, No. 11-6724 at 11 (E. D. Pa. July 31, 2012); Watson v. Astrue, No. 10-4720 at 9 (E.D. Pa. Jan. 18, 2012); Harmon v. Astrue, No. 10-6781, 2012 WL 94617, at *2 (E.D. Pa. Jan. 11, 2012); Washington v. Astrue, No. 08-2938, 2009 WL 855893, at *1 (E.D. Pa. March 31, 2009); Thompson v. Barnhart, No. 5-395, 2006 WL 709795, at *15 (E.D. Pa. March 15, 2006); McKitrick v. Barnhart, 364 F.Supp.2d 1272, 1288 (D. Kan. 2005); Wood v. Astrue, No. 12-5657, at 6-7 (E.D. Pa. March 25, 2013).

[8] Lindsay v. Colvin, No. 12-7159, at 21 (E.D. Pa. Feb. 25, 2014); Battle v. Colvin, No. 12-4069 (E.D. Pa. Sept. 25, 2013); Thompson v. Astrue, No. 07-3259 at 9 (E.D. Pa. April 2008); Davis v. Astrue, No. 6-3550, 2007 WL 2248830 (E.D. Pa. July 30, 2007).

[9] The Commissioner argues that an ALJ's Paragraph B ratings are separate from the RFC determination, and neither regulation nor Third Circuit caselaw require their direct incorporation into VE hypotheticals. Def. Br. at 12 (citing SSR 96-8p, 1996 WL 374184, at *4 ("the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment, but are used to rate the severity of mental impairment(s) at steps 2 and 3"). Although this argument may have merit and cast doubt on the numerous district court decisions holding otherwise, I need not reach this issue because, as described here, the ALJ properly incorporated portions of Nichols' mental health profile when accounting for her physical limitations.

that was only semi-skilled (id.) and other positions in the national economy that are merely unskilled (id. at 69). There is no evidence – or even a suggestion by Nichols – that she suffers greater functional limitations from her mental health impairment. Thus, even if the ALJ should have included Nichols' mild impairments in the hypothetical, any possible error is harmless. See Shinseki v. Sanders, 556 U.S. 396, 406 (2009) (harmless-error rule applies to judicial review of administrative proceedings).

Moreover, when Nichols began mental health treatment at the end of April 2011, she reported she had been experiencing the same mental health symptoms "off and on since [she was] 16 years old," and specified that the onset of her current set of symptoms – i.e. feeling "mad, depressed, stressed" began only in January 2011 – after her date last insured, but before her evaluation by Dr. Hart. Id. at 664. To the extent that Nichols' depression was the same in April 2011 as it had been before, she has already proven that she is capable of performing her prior relevant work despite her mild mental health limitations. To the extent that any of her limitations are different, the date of onset followed her date last insured, and the limitations have no relevance here.

Finally, the ALJ discounted Nichols' "statements concerning the intensity, persistence and limiting effects of [her] symptoms." Id. at 28. She thoroughly reviewed the medical record and noted that despite Nichols' "allegations of ongoing dizziness, falls, tingling and numbness in her extremities, shaking and tremors, the medical evidence of record does not indicate further treatment or complaints after January 2011." Id. at 30. This finding merits deference. Van Horn, 717 F.2d at 873. Nonetheless, the ALJ gave Nichols "the benefit of the doubt" and adjusted her residual functional capacity assessment to accommodate her claims. Id.

With respect to Nichols' alleged neck and back pain, the ALJ reviewed the medical records and noted Nichols received no "more than conservative treatment," had been found most recently to have "normal range of motion," and that her RFC had been adjusted to address the allegations. Id. In terms of migraines, the ALJ also fully reviewed the medical record and the differing treatments Nichols had received before, during, and after her pregnancy, and reduced her RFC accordingly. Id. The ALJ summarized that Nichols' alleged functional limitations were unsupported because treatment records show her initial symptoms had largely resolved by January 2011, and that she was only treated for migraines and depression after that time. Id. The migraines, however, had been controlled on medication, and were also accommodated by the RFC. Id. Even combined, Nichols' migraines and depression were treated conservatively, and the reports of her activities did not comport with the level of her alleged limitations. Id.

The ALJ had substantial evidence to support her credibility determination, and explained how the mild limitations acknowledged in Step 2 were properly incorporated into the RFC and included in the VE's hypothetical. Because Nichols' alleged limitations are "supported by some medical evidence but controverted by other evidence in the record," Zirnsak, 2014 WL 7799983, at *7, the ALJ properly exercised her discretion in declining to submit any additional restrictions to the VE based on Nichols' mild limitations in the Paragraph B functional areas.

Accordingly, I make the following:

**R E C O M M E N D A T I O N**

AND NOW, on February 25, 2015, it is respectfully recommended that Nichols' request for review be DENIED and judgment be entered for the Commissioner. Nichols may file objections to this Report and Recommendation within fourteen days after being served with a copy thereof. See Fed. R. Civ. P. 72. Failure to file timely objections may constitute a waiver of any appellate rights. See Leyva v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

BY THE COURT:


\_\_\_/s/ Timothy R. Rice_____
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE